## CHICAGO & N. W. RY. CO. v. BOOTEN.

### No. 9284.

Circuit Court of Appeals, Eighth Circuit.
March 16, 1932.

Rehearing Denied April 26, 1932.

Wymer Dressler, of Omaha, Neb. (Robert D. Neely, of Omaha, Neb., and Samuel H. Cady, of Chicago, Ill., on the brief), for appellant.

Emmet L. Murphy, of Omaha, Neb. (Edward F. Fogarty, Herbert H. Meile, E. Melvin Kennedy, and K. G. Harvey, all of Omaha, Neb., on the brief), for appellee.

Before KENYON, VAN VALKENBURGH, and GARDNER, Circuit Judges.

KENYON, Circuit Judge.

Parties will be designated as in the trial court.

Defendant (appellant) was the owner of a grain elevator which it built just off its right of way in the city of Council Bluffs, Iowa, and leased to the Updike Grain Company. The last lease entered into between the parties, and which was in force at the time of the accident complained of in the instant case, the lease of November 23, 1928, contained, among others, the following provisions:

"Five. Lessee agrees to conform the business conducted upon said leased premises, and the operation thereof, to the laws relating thereto and to all requirements of any properly constituted public tribunal or officer, federal, state and municipal, and to the reasonable directions and requirements of insurance companies carrying insurance upon

the premises or property thereon or therein. ⁗ * *

"Nine. Lessor agrees to keep the property leased in good and sufficient repair excepting unforeseen casualties but the Lessor shall not be required to renew, replace or repair any depreciation or wear caused by the operation of the business of Lessee on said premises." ,

In this elevator, cars of grain to be unloaded are run in on a track inside the elevator. Some 18 feet above the track, or some 6 or 8 feet above the top of the ordinary box car, there is a concrete platform which supports the machinery used for unloading. This platform is about 75 or 80 feet long, and some 7 or 8 feet wide. Along each side of the platform there is a handrailing to prevent any one working on the platform from falling or stepping off. Access to the platform is had by an iron ladder placed at each end thereof.

Running the entire length of the platform are two revolving iron shafts, each about 2 and ¹⁵⁄₁₆ inches in diameter, and each placed about 13 inches above the floor of the platform. Each shaft is held up off the floor by a series of bearings, some 8 feet apart, each of which is inclosed by a hollow concrete box, open at the top. Three of these boxes (three for each shaft; six in all) also contain drums around which cables are wound. Directly below these particular pairs of boxes the cars to be unloaded are placed. The cables are attached to mechanical shovels by which the grain is removed from the cars into the elevator. The machinery is automatic, so that when a man in the car below pulls on the cables, this causes the clutch on the drum to operate and pull up the shovel, thus unloading the car. The source of power for the whole operation is electricity, and the shafts by which the power is thus carried to the drums turn at the rate of some 60 to 70 revolutions a minute.

Each shaft is about three feet from the nearest handrailing; so that a person oiling the machinery has a three-foot space in which to stand, except where that space is narrowed very considerably by the concrete boxes containing the bearings and drums. Since the top of the boxing does not extend to a higher point than the center of the shafts, it is probably the fact that the boxing does not extend more than 15 inches at the most off the base of the platform. And the drums within the boxing clearly extend above the top of the boxing.

While there is thus a walkway in which a person may stand while oiling the machinery, the testimony shows that there never had been any guards or housing over any of the machinery except the drums; and that such guards as had originally been there, but had been since removed, were directed not so much to the purpose of safety in oiling, etc., as to the purpose of keeping the cables from slipping off of the drums.

At about 7 o'clock on the morning of January 15, 1930, plaintiff, an employee of the Updike Grain Company, went upon the platform for the purpose of oiling the machinery. At that time the east shaft (the platform runs north and south) was not turning at all, and plaintiff proceeded along the west walkway from north to south, washing the drums with coal oil, and oiling the bearings as he proceeded. As he reached the box containing the third and final drum, the accident complained of in the instant case happened to him. His clothing was some way or other caught in the machinery, with the result that it was wound around the west shaft, breaking his arm and leg and causing the injuries complained of.

Just before the shaft entered this particular concrete box, there was around it an iron collar out of which a piece was found to have been broken. There is a possibility that the broken edge of the collar is what first caught plaintiff's clothing, for it is difficult to see how clothing could have been caught on a plain round shaft; although it seems that the only place where rust was wiped off of the shaft as a result of the accident was some 8 or 10 inches north of where the collar commenced. The District Court instructed the jury that liability in the instant case could not be based on the fact of the broken collar. He instructed the jury that the only basis of liability was whether "Said defendant negligently failed to place a guard on or about said revolving shaft as required by the laws of the State of Iowa as hereinabove set out, either at or prior to its leasing of said premises to said defendant Grain Company or at any other time." The jury returned a verdict for plaintiff, and judgment was entered thereon.

The statute of Iowa which plaintiff claims defendant violated is chapter 73 of the Iowa Factory Act, section 1487, Code of Iowa, 1927, which is as follows: "Safety appliances—guarding machinery. It shall be the duty of the owner, agent, superintendent, or other person in charge of any workshop, manufacturing or other industrial establishment or concern operated by machinery, ei-

ther in a fixed location or when portable and moved from place to place therein in carrying on such industry, so far as practicable, to install and keep in order belt shifters or other safe mechanical means for throwing belts on and off pulleys, install loose pulleys, and protect, by guards or housing, all gearing, cogs, belting, shafting, tumbling rods, universal or knuckle joints, set screws, saws, planes, and other machinery, when so located or used that employees may receive injury thereby. The provisions of this chapter shall not apply to agricultural pursuits."

While many questions are raised in the assignment of errors, two important and controlling ones should receive major attention, viz.: (1) Was there a duty incumbent upon defendant under the statute of Iowa above quoted to house or guard the machinery at the point where the accident occurred? (2) Did the District Court commit reversible error in the exclusion of testimony offered bearing on the question of whether it was practicable to install guards or to house the machinery at the place of the accident, and whether such place was one where "employees may receive injury"?

It is insisted that plaintiff as a matter of law was guilty of contributory negligence. The question of contributory negligence under all the facts and circumstances shown in this record is so clearly one for the jury that we shall spend no time on it. United States Gypsum Co. v. Karnaca (C. C. A.) 216 F. 857; Wheeler v. Sioux Paving Brick Co., 162 Iowa, 414, 142 N. W. 400.

The serious question in the case is the applicability of the statute hereinbefore quoted to the situation presented. If the injury occurred at a place where there was probability of an employee of the grain company receiving injury, and if it was practicable in carrying on such industry to protect employees against dangers by guards or housing at such place, then was there a duty upon the part of the owner of the premises to install protective appliances, and keep the same in order? If there was, the failure to perform such duty was negligence, and if this was the proximate cause of the injury to plaintiff defendant would be liable, provided plaintiff was not guilty of contributory negligence.

The attempt here is to fasten liability on an owner not actively operating the plant, but who has leased the same to an elevator company, with the agreement in the lease to keep the property in sufficient repair.

The general rule as to liability in the relationship of landlord and tenant is expressed in two Iowa cases as follows: Morse v. Houghton, 158 Iowa, 279, 136 N. W. 675, 676, "A landlord is not liable for injuries to a tenant resulting from alleged negligent construction, which was in no wise concealed from or misrepresented to the tenant at the time of the letting," and Updegraff v. City of Ottumwa et al., 210 Iowa, 382, 226 N. W. 928, 929, 930, "The law is doubtless well settled in this and most, if not all other, jurisdictions that the landlord who has parted with full possession and control of his premises by lease to a tenant is not liable for injuries to third persons caused by the negligence of the tenant. * * * But, on the other hand, if the nuisance exists at the time the lease is executed, a covenant therein requiring the tenant to make repairs at his own expense will not relieve the landlord from liability for injuries occasioned thereby." See, also, Holton v. Waller et al., 95 Iowa, 545, 64 N. W. 633; Flaherty v. Nieman, 125 Iowa, 546, 101 N. W. 280; Morse v. Houghton, 136 Iowa, 279, 136 N. W. 675; Fraser v. Kruger et al. (C. C. A.) 298 F. 693; Doyle v. Union Pacific Railway Co., 147 U. S. 413, 13 S. Ct. 333, 37 L. Ed. 223.

This case is not based on the ordinary relationship of master and servant. All charges of negligence in plaintiff's petition were eliminated by the court except the one based upon violation of an alleged express statutory duty. If section 1487, Iowa Code of 1927, supra, placed upon the owner no duty unless he was in charge of and in control of the property, then under the theory upon which the court submitted the case to the jury, no other question of negligence being involved, there could be no recovery. In other words, the liability is dependent upon whether defendant neglected to perform an express duty which the law imposed upon it. If there was a duty imposed by statute upon defendant to guard and house the machinery at the place where the accident occurred for the benefit of parties using said machinery, then defendant could not absolve itself from that duty or delegate it by leasing the property to the grain company. This distinction is clear cut and is pointed out in some of the cases cited by defendant, as in Doyle v. Union Pacific Railway Co., 147 U. S. 413, 424, 425, 13 S. Ct. 333, 338, 37 L. Ed. 223, where the court quotes from Bowe v. Hunking, 135 Mass. 380, 46 Am. Rep. 471, as follows: "'If the action can be maintained it must be on the ground that it was the duty of the defendants to inform the tenant of the

defect in the staircase. This duty if it exists, does not arise from the contract between the parties, but from the relation between them, and is imposed by law. If such a duty is imposed by law, it would seem that there is no distinction, as a ground of liability between an intentional and an unintentional neglect to perform it. * * * ' " In Hayes v. Northern Pac. R. Co. et al. (C. C. A.) 74 F. 279, 282, the court refers to the distinction as cited by the Supreme Court of Kansas in St. Louis, W. & W. Railway Co. v. Curl, 28 Kan. 622, that: " 'When the injury results from the omission of some duty which the lessor itself owes to the public in the first instance,—something connected with the building of the road,—then we think the company assuming the franchise cannot divest itself of responsibility by leasing its track to some other company.' " To the same effect is Southern Ry. Co. v. Hussey (C. C. A.) 42 F.(2d) 70, 74 A. L. R. 1172. No contention would be made that such is not the rule where the statute imposes a duty as to the public.

Defendant contends here that the provision of the Iowa statute in question has no applicability to the situation presented, that the command of the statute is addressed to the employer (the grain company) and not to the owner of the property, and that the owner of the property having leased the same and surrendered possession has no duty under this statute as to plaintiff, unless he is also his employer; in other words, that the Iowa Factory Act is a regulation entirely between master and servant, and goes no further. The argument is that plaintiff was a servant of the grain company, his employer, and not of defendant, the owner of the property, and that defendant cannot be liable because he was not the employer. That is the square question presented here. If defendant's theory is correct, then plaintiff should not have recovered in this action. The trial court did not accept this theory, but held that the Factory Act, in force when the accident happened, placed a burden on the owner of the property, even though not in charge of the operation of the elevator. This court is divided on that proposition, Judges VAN VALKENBURGH and GARDNER holding that the Iowa Factory Act is not applicable to the situation presented here and that the trial court should have instructed a verdict for defendant. The writer of this opinion believes the trial court was correct in its holding that the act applied to the owner of the property, even though said owner was not in charge of the elevator business. What is here said therefore on that subject is the opinion of the writer and not the opinion of a majority of the court, and might more properly be in a dissenting opinion. The question is so close and of such importance that I discuss it at some length. Counsel for defendant asserts in his brief that the Iowa Supreme Court "has repeatedly held that the factory act involved in this case is a regulation of the relation of master and servant. The owner of an establishment is not affected, unless he is also the employer of the injured servant." The cases cited which it is claimed so hold are Wheeler v. Sioux Paving Brick Co., 162 Iowa, 414, 142 N. W. 400; Plew v. James Horrabin & Co. et al., 176 Iowa, 584, 157 N. W. 453; Nodland v. Kreutzer & Wasem, 184 Iowa, 476, 168 N. W. 889; Hainer v. Churchill (Iowa) 173 N. W. 882. In each of these cases defendant was the employer or master, and he was also the owner, and the court does use the language "employer, master." The writer does not think these cases indicate conclusively that the Supreme Court of Iowa regards the Factory Act merely as a regulation of the duties of master and servant, as the question was not involved in any of these cases as to the liability of the owner under the statute, who was not in possession or control of the property; nor has the Supreme Court of Iowa, as far as I have been able to ascertain, ever passed on that question. If the Iowa Legislature had so intended, it would have been an easy matter to have had the act read, "Every employer operating any manufacturing or other industrial establishment, etc." In Wheeler v. Sioux Paving Brick Co., 162 Iowa, 414, 142 N. W. 400, 401, 402, the court, in referring to a similar statute as contained in a previous Code, says: "There is no controversy over the fact that the set screw on the collar of the revolving shaft was unguarded. Such condition was therefore one which the provisions of Code, § 4999A2, requires shall be protected against, by making it the duty of the owner or person in charge of such machinery to keep it properly guarded. A failure to meet such duty is negligence." It is to be noted the term "owner or person in charge" is used.

In Updegraff v. City of Ottumwa et al., 210 Iowa, 382, 226 N. W. 928, where the court was dealing with an ordinance which made it unlawful for an owner of property to permit the down spouts or gutters from any building to be so constructed as to directly or indirectly discharge water upon any

of the sidewalks of the city, and which provided that the same should be constructed so as to run the water from the building which was drained into gutters or sewers, it was held there was an affirmative duty upon the owner of the property (not in possession), not only to construct the down spout in a safe condition, but to maintain it so as not to discharge water upon the sidewalk, and the absent owner was held liable. This was an ordinance, of course, affecting the public at large, to which proposition we later advert.

I turn to decisions under somewhat similar statutes.

In Tvedt v. Wheeler, 70 Minn. 161, 72 N. W. 1062, 1063, 1064, chapter 7, Laws of Minnesota of 1893, entitled, "An act for the protection of employees," was under consideration. It provided for certain means of protection as to hoistways, hatchways, elevator wells, etc., in factories, mills, warerooms, and stores by fencing the same. The question was whether the owner of the building who neglected to comply with that statute while the building was in his possession and turned it over to the lessee in that condition, with no fences or guard about the appliances, was liable to an employee of the lessee injured by reason of the fact that there was no guard at the point in question. The court said: "While the statute does not impose the duty of guarding such appliances upon the owner by name, its terms being positive and sweeping, that such appliances shall be so guarded, yet there is no reason why the owner of a building should not be required to comply with the statute, as to such dangerous appliances as are a part of his building, before he delivers the possession of the building to his lessee, and we so hold." The owner was held liable to an employee of the lessee who was injured after defendant had surrendered the premises to said lessee. This act was entitled, "An act for the protection of employees," but the court held there was a duty upon an owner not in possession, although he was not the plaintiff's employer.

In Tralle v. Hartman Furniture & Carpet Co. et al., 116 Neb. 418, 217 N. W. 952, 955, 956, there was an ordinance of the city of Omaha providing that freight elevator platforms should be equipped with a wire mesh guard over the top of the same. The store building in the case was owned by defendants, the Websters, and occupied by the Hartman Furniture & Carpet Company under a lease with the owners. Plaintiff was operating a freight elevator. While doing so an employee of another contractor dropped a hammer accidentally down the elevator shaft which struck Tralle on the head, resulting in his death. Suit was brought by the administratrix claiming that the owners had failed to comply with the requirements of the city ordinance. The lease required lessee to keep the interior of the building in repair, and provided the lessee would protect the lessors from damages. The court said: "There was elaborate argument on the proposition that under the lease the owners lost possession of the building and the right to enter it for the purpose of complying with the ordinance and consequently were not liable to plaintiff for the negligence of lessee's servants. This position does not seem tenable. The lease is a part of the petition. It required permission of lessors for the making of interior repairs and obligated lessee to protect the former from damages, but it also authorized them to terminate the tenancy for noncompliance with the terms of the lease. The duty of lessee also to equip the elevator with an overhead guard while controlling and operating it under the lease, or to permit the owners and lessors to do so, was therefore enforceable. The leasing of real property does not necessarily exempt the owners from liability for failure to supply safeguards required by law. Tvedt v. Wheeler, 70 Minn. 161, 72 N. W. 1062. There is a prevailing tendency to hold mandatory duties nondelegable."

Tomlinson v. Marshall et al., 208 Mo. App. 381, 236 S. W. 680, 683, is a case where the injury complained of resulted from failure to guard laundry apparatus as required by sections 6786 and 6806, Revised Statutes of Missouri, 1919. Those sections were summarized by the court as follows: "Section 6786 says such machines as the one in question shall be guarded when possible, without saying who shall be required to place or maintain the guards. Section 6806 is very sweeping in its terms, and makes every one who assists, or aids, or abets the violation of the statute liable. That, it seems to me, means to include, and does include, every person who is a party to putting the unguarded machinery into operation or the maintaining of it in that condition." While the court there did find defendants to have occupied the relationship of partner in the business rather more than lessor, it considered the case as though the defendants were lessors. Defendants did not own the building. They owned the laundry plant, and they failed to have the machinery which injured plaintiff

guarded. They leased the plant with the machines in an unguarded condition, and the court says, 208 Mo. App. 381, 236 S. W. 680, 682: "The question is whether, under these circumstances, they come within the meaning of section 6806, in that they, as owners of that going business, by leasing the same with the machines thereof unguarded, have not thereby assisted, or, as the statute puts it, aided and abetted, the tenant in violating section 6786, and thus rendered themselves liable in damages to one injured by such unguarded machine." While the court emphasized the fact that defendant owned the machinery, as distinguished from the building, the result could not have been different had the defendant owned both the machinery and the building, as in the instant case. Evidently the court intended to distinguish the case of where the landlord owned the building alone and the tenant installed machinery of his own. The court said, 208 Mo. App. 381, 236 S. W. 680, 683: "Here the defendants, as landlords, lease a going concern, an operative laundry, the machinery of which they are maintaining in a condition forbidden by the statute, and they lease it to a tenant for the purpose of operation and knowing for a certainty that it will be operated by employees. Under the above statutes and the general law regulating liability for a violation thereof, it would seem that they would have no more right to lease it in that condition than they would have to operate it in that condition." The court also referred to the analogy of the fire escape cases, to which I shall hereinafter refer.

Bearing on this question is the decision of this court, in J. I. Case Threshing Mach. Co. v. Buick Motor Co., 39 F.(2d) 305, 309. A violation there of an ordinance requiring automatic gates on elevators in the city of Kansas City was involved. The same contention as to ownership was made there as here. Injuries were sustained by an employee of the tenant as a result of the failure of the absent landlord, owner, to comply with the safety ordinance. The case was submitted to the jury. This court said: "The question whether the alleged violation of the ordinance was the proximate cause of the accident and the injury was properly and correctly submitted to the jury; as was also the question of contributory negligence on the part of Hale." Also, on page 306 of 39 F.(2d), "It was the contention of appellant that it was not in control of the elevator; that it had not agreed to maintain it and keep it in repair; that there was no negligence on its part, but that Hale was guilty

of negligence which caused the accident; that even if there was an implied agreement to maintain the elevator when the first floor was rented, yet, when all the floors became rented to appellee, the control of the elevator passed to it with the duty to maintain and repair."

I think these different cases tend to show that these safety acts to prevent injury to workmen in factories are not merely regulations between employer and employee, and that the owner of the building may be liable for damages under such an act as we are considering to an employee of the tenant, though he be not an employee of said owner. The principles in the fire escape cases are somewhat analogous. Wardwell v. Cameron, 126 Minn. 149, 148 N. W. 110, was an action for damages against the owner of a building where it was claimed that the owner had not complied with the laws of Minnesota, section 5108, General Statutes 1913, with relation to fire escapes. The court said: "If the landlord owes a duty to a tenant in the matter of providing fire escapes, the same is also owing the members of the family, the servants, and the guests of the tenant." In Adams v. Inn Co., 117 Tenn. 470, 101 S. W. 428, under an ordinance providing for fire escapes, the court held they were not only to be provided for the guests, but employees as well. The laws of New York, at the time of the facts taking place in the case of Paulcy v. Steam Gauge & Lantern Co., 131 N. Y. 90, 29 N. E. 999, 15 L. R. A. 194, provided that fire escapes shall be installed on the outside of factories three or more stories in height. It was contended that the sole remedy under the statute was the public remedy for the enforcement of penalties for violation of the act. The court said, 131 N. Y. 90, 29 N. E. 999, 1000, 15 L. R. A. 194: "The requirement of fire-escapes was for the direct and special benefit of the operatives in such factories, and intended for their protection; and the rule applies that when a statute commands or prohibits a thing for the benefit of a person he shall have a remedy upon the same statute for the thing enacted for his advantage, or for a wrong done to him contrary to its terms." It was held in that case that there was no negligence on the part of defendant and hence no liability.

The case of Rose v. King, 49 Ohio St. 213, 30 N. E. 267, 15 L. R. A. 160, is a very enlightening one. The statutes of Ohio in force at that time made it the duty of an owner of any tenement house more than two stories high to provide an exit from the different

upper stories which would be easily accessible in case of fire. It was held that a tenant in a tenement house who without fault on his part receives injury because of the neglect of the owner to comply with the requirement of the statutes could maintain a civil action for damages against the owner. In this Ohio case, the parties protected were tenants in a tenement building. It was not a case of the public at large being affected. Carrigan v. Stillwell, 97 Me. 247, 54 A. 389, 390, 61 L. R. A. 163, is a case arising by alleged failure of the owner of a building to provide fire escapes. The act under which the action was brought against the owner required fire escapes on "every building in which any trade, manufacture, or business is carried on, requiring the presence of workmen above the first story." The question there was whether there was liability on the part of the owner; the building being in possession of the tenant. The statute did not enforce the duty on any particular person. The court held the owner was not relieved by the fact the tenant was in possession. Some of these cases bear upon the suggestion that where a statutory duty is imposed upon the owner or landlord which he cannot escape by leasing of the premises it applies only where such duty is imposed for the benefit of the public. As to this it may be said, why is not the great body of men and women working around dangerous machinery a part of the general public? In Rose v. King, supra, tenants were held to be. In Carrigan v. Stillwell, supra, workmen were held to be. Where a statute is enacted to protect workmen in factories from the dangers of machinery or requiring owners of buildings to place fire escapes on factory buildings, why is there not a duty owing to the workmen on the part of the owner for the violation of which an injured party may maintain action? Is it sufficient to answer them that they are not a part of the public, and that such statutes are only for the protection of the public? There is really no good reason why the owner of a hotel who fails to provide fire escapes shall be liable to inmates of the hotel who are injured thereby any more than where the owner of a factory fails to provide fire escapes for the protection of the employees. Both are a part of the general public.

What duty does the Iowa statute place upon the owner of the property not in possession to an employee of his lessee?

In construing this statute, its purpose must be kept in mind. There has grown up in this country a public consciousness that men and women injured in industry shall not be turned out in mangled and crippled condition without compensation, their ability to earn a livelihood destroyed, and the burden of their support and their families put upon the public, but rather that the results of such injuries shall be a part of the burden the advanced industrial life of this country must carry. Speaking of this very statute, the Supreme Court of Iowa in Plew v. James Horrabin & Co. et al., 176 Iowa, 584, 157 N. W. 453, 454, says: "The purpose of the statute above quoted, as is very apparent from a reading of its provisions, is to secure so far as is reasonably practicable, the safety of all who may be exposed to danger from the operating of machinery in manufacturing or other establishments, and especially to promote the safety of workmen who are required, in the performance of their duties, to handle or work with such machinery or in close proximity thereto. The manifest danger of working with unguarded machinery and the great number of those suffering death or injury therefrom have been generally recognized, and in nearly every state laws have been enacted, making it incumbent on the owner of such machinery to cover or guard its gearing and other movable parts to prevent injurious consequences to any one accidentally or inadvertently coming into contact therewith. As measures provided in the interest of human life, they are liberally construed by the courts to promote their humanitarian purpose." It is to be noted here that the court speaks of the *owner* of such machinery. Defendant here was the owner of the machinery. Again, in Hainer v. Churchill (Iowa) 173 N. W. 882, 883: "The propriety of such legislation has been emphasized by the increasingly great number of men, women, and children employed to serve in and about factories, mills, shops, and other industrial works, where they are exposed to danger from the operation of machinery, and to insure observance by employers of their duty to provide their employees reasonably safe places in which to work." See, also, Tvedt v. Wheeler, 70 Minn. 161, 72 N. W. 1062. The term "employees" is here used.

I have referred to the humanitarian purposes of these acts for the protection of men and women working around dangerous machinery as bearing upon the construction to be given the statute we are considering. If a statute is susceptible of two constructions, as this statute is, then the court should adopt the one which will make effectual the intended purpose of the same, if it can be, done with-

out violence to the language used. Greenbush Cemetery Ass'n v. Van Natta, 49 Ind. App. 192, 94 N. E. 899; Grubb v. Turner, 259 Ill. 436, 102 N. E. 810. A reading of section 1487 of the Code of 1927 is sufficient to satisfy one that the statute is a very loosely drawn one, and susceptible of various interpretations. The statute begins with these words: "It shall be the duty of the owner, agent, superintendent, or other person in charge of any workshop, manufacturing or other industrial establishment or concern operated by machinery," etc. This elevator was a "concern operated by machinery." The railway company had built this elevator undoubtedly for the purpose of increasing its grain haulage, but it was not itself engaged in the elevator business. It was not a party "having charge of" the business.

Does the statute mean that, in order that any duty be placed upon the owner, with regard to installing or keeping in repair housings and guards to protect employees against dangerous machinery, it must have charge of the business?

As a matter of grammatical construction, such meaning could be given to the statute, and the phrase "having charge of" can be held to modify the word "owner" as much as the words "agent, superintendent or other persons." That is one construction of this statute that can be adopted. Such construction is fatal to plaintiff's right to recover against defendant. The statute can be construed also that the duty imposed by it is upon the owner primarily, or the agent, superintendent, or other persons "having charge of" the industrial plant.

When is an "agent" or "superintendent" "in charge of" a concern in the sense of having the absolute and ultimate control, and when is a corporate "owner" "in charge of" the concern in the sense of having responsibility for internal management?

If the agent or superintendent is in charge for the owner, then the owner is in charge; if for the lessee, then the lessee is in charge.

Appellant's contention is supported somewhat by the case of Hane v. Mid-Continent Petroleum Corp. et al. (D. C.) 43 F.(2d) 406, 407, and the same case (D. C.) 47 F.(2d) 244, where additional defendants were involved. This case was under the Oklahoma statute, and the question arose with relation to the removability of the case to the Federal court by a nonresident corporation. If the action was joint, the case was not removable. The court held there was no joint liability imposed by the Oklahoma Factory Act upon the corporation and its superintendent, and the court reached this result by finding that the latter was not liable. The Oklahoma Factory Act (Comp. St. Okl. 1921, § 7229) reads: "The owner or person in charge of," etc. A proper grammatical construction there would allow "in charge of" to modify "owner" as much as "person." The court held that the owner and person in charge were not jointly liable, and says that the disjunctive "or" is used in the statute which evidences the legislative intent that only one person shall have such duty, and that shall be either the owner or the person in charge. The court says:

"The purpose of the statute was to provide for the protection of persons coming in contact with or near machinery, etc., and the terms of the act are satisfied by a construction which requires the person who has charge and control of the machinery to provide the necessary guards and protection. To be more explicit, the person who controls and has charge of the machinery for the purpose of changing, building, tearing down, or otherwise handling, removing, or constructing it should bear the responsibility of providing guards and protection, and in my opinion the statute is not intended to impose such a duty upon an employee, foreman, or superintendent who has the mere supervision and control of the operation of the pump or engine. A distinction exists between being in charge of the factory and machinery and having the charge of the operations for another of such a factory.

"There may be situations where the person in charge of the factory, other than the owner thereof, should be liable for damages and subject to the penalties provided in the Factory Act for failure to comply with its terms. For example, a lessee of a factory, or an independent operator, should bear those responsibilities, for he would be in charge of the factory, which is more comprehensive than having charge of the operation thereof. The intent of the statute is to provide for the protection of persons, and the legislative intent seems to impose such a duty upon the owner or the person in charge of the factory or any institution where machinery is used, rather than upon the person in charge of the operation of such a factory or institution.

"It seems obvious the phrase used in the statute, 'or person in charge of a factory or any institution,' has reference to a lessee or contractor who employs the laborers engaged in operating the business. Any other con-

struction of the statute would be unreasonable."

The result is that the person in "charge" is liable only if he is a certain kind of "person in charge"; otherwise the owner remains liable even if he is not, technically speaking, "in charge." The holding of the court is that only one person shall have upon it the duty, and that one shall be either the owner or the person in charge, and the lessee is considered such a "person in charge." The construction given by the District Court (as these were both District Court cases) to the word "or" could hardly be used in construing the Iowa statute. The Oklahoma statute does not include "agent" or "superintendent." If one follow the doctrine of these two cases, can it be said that the Iowa statute "clearly evidences a legislative intent that only one shall have such duty?" If so, which is the one? The agent or superintendent would come under the Hane Case interpretation of the phrase "other person." Can the doctrine be established that the master is not liable when the agent or superintendent is? If two persons could conceivably be liable, such as an owner and a lessee, just how would it be determined which would be liable under the Oklahoma construction as applied to the Iowa statute? The difficulties would be manifold. In the opinion in the Hane Case (D. C.) 47 F.(2d) 244, 246, the court said: "The Factory Act renders liable only the owner or person in charge, and, as pointed out in the opinion referred to above, does not impose liability upon both the owner and person in charge. The statute speaks in the disjunctive, rather than in the conjunctive, and, as construed, renders liable the owner, unless the person in charge is a lessee or an independent contractor, as distinguished from an employee having charge of the operations, even with authority to alter or change the engine." This doctrine if here applied would result in a situation where appellant could defend on the ground that the Updike Grain Company is the party upon whom the duty rests. In turn, the Updike Grain Company could defend on the ground that its superintendent is the one upon whom the duty rested, which makes apparent that the Iowa statute cannot reasonably be interpreted by making the owner liable, as in the Oklahoma case, only in case the lessee or agent or superintendent is not liable. In the Hane Case (D. C.) 43 F.(2d) 406, 407, 408, the court did say, however: "The person who controls and has charge of the machinery for the purpose of changing, building, tearing down, or otherwise handling, removing, or constructing it should bear the responsibility of providing guards and protection."

Housing or guarding such machinery entails additional fixtures, which also become a part of the realty. The installation of safety devices would naturally be when the structure was built. If such a burden is to be placed upon any one, it should be a burden upon ownership. The shafting at the place of injury was a part of the plant itself, constructed by defendant for the very purpose for which it was used at the time of the accident. Defendant had complete control of the building at the time it was leased, and it had no more right to lease it in a dangerous condition for operation by its lessee in violation of the statute than to have itself operated it in such condition. It had the right under its lease to go upon the premises and make repairs.

I do not think it was the purpose of the statute to relieve the owner of liability unless he was in control, but that the intent was to place the duty primarily upon it to install guards and housings to protect employees from danger where the same is practicable at such places as they may likely receive injury. To more effectively accomplish the purpose of safeguarding human life, the statute has placed a duty upon those persons to whom the owner or lessee would naturally delegate authority, i. e., superintendents and agents. They would be the ones with whom the state factory inspector would come in contact, and would naturally be the ones to call the owner's attention to machinery in need of guards or housings. Imposing the duty upon such persons as well as the owner, and bringing them within the penal provisions of section 1494 (2) of the Factory Act, as well as within the resulting civil liability to persons injured, was in all probability thought by the Legislature to be a way of making section 1487 really preventive of injury to human life and limb; and was not intended to accomplish the purpose of relieving the owner. If under the act the owner has no duty to see that proper guards are provided as to dangerous machinery unless he is in charge of the business, and a lease were made to an irresponsible tenant, the owner would escape liability and the act be easily circumvented. It was the duty of the owner here to install the safety devices if it was practicable so to do at places where employees were likely to receive injury. The two latter propositions, of course, are matters of fact to be determined in a trial.

The duty is on the court to construe this statute. It may give it a construction that there is no duty on the owner as to safety appliances in the operation of this elevator unless the owner is in charge thereof, and such construction could be justified by the grammatical uncertainty; or it may construe it to impose a duty upon the owner at the time it leased the premises regardless of subsequent possession to have the dangerous machinery guarded as far as practicable at such places where employees might probably be injured. The real meaning I think of this statute is the same as if the disjunctive "or" were inserted between the words "owner" and "agent," which would cause it to read, "the owner or the agent, superintendent or other persons having charge, etc." The latter construction makes effectual the purposes of the act, and should be adopted.

■ The other troublesome question in this case arises concerning the exclusion of certain evidence by the court, referred to more specifically hereinafter. Section 1487, Iowa Code 1927, is not imperative as to guarding against all dangerous machinery, but is limited by the term "so far as practicable" and to the place where "employees may receive injury." Of course an employee may receive injury in any place, and the term should not be given a literal interpretation. It means a place where there is a reasonable possibility of injury to employees. In Mc-Carney v. Bettendorf Axle Co., 156 Iowa, 418, 136 N. W. 920, 924, where an earlier Iowa statute of the same nature (section 4999a2, Code Supp. 1907) not containing the clause "when so located or used that employees may receive injury thereby," was being considered, it was held that the act included such machinery as "might reasonably be anticipated to cause injury unless provided with appropriate guards." To the same effect, United States Gypsum Co. v. Karnaca (C. C. A.) 216 F. 857. There the term "machinery of every description," as found in the act, was construed as intended to require the guarding of all machines of a character dangerous to employees operating them or working in their vicinity. The trial court in the case at bar, referring to the word practicable, made very clear to the jury the correct view of the same, stating in his instruction: "Now, that word 'practicable' as used in these instructions means 'feasible' and consistent with the complete and full use of the shafting, collar and machinery for the purposes for which they were intended and used. No housing or guard would be practicable which would substantially inter-

fere with or prevent such use of the machinery, but, on the other hand, the defendant could not be relieved from the duty imposed by the statute on the ground merely that a guard or housing was not customary in such plants or that it would involve some expense or that it would cause some inconvenience."

The trial court permitted evidence on the question of whether it was feasible to guard the alleged dangerous machinery, but attempted to limit such evidence to the place of the accident. Plaintiff was permitted to show that a person might catch a sleeve in the clutch of the drum, which was testified to by plaintiff's witness, Jeffers. On the cross-examination of witness, Nelson, defendant's counsel brought out that the most dangerous part of the machinery on the shafts was the clutch and the drum part of the machine, and there is some testimony that plaintiff was leaning forward to reach the far side of this drum at the time of the injury. He is not clear as to just what caught his clothes and brought about the injury. Defendant contends that the plaintiff by the evidence of Jeffers made an issue of the unguarded condition of the drums and clutches, and the possible relation of that fact to plaintiff's injuries, and that the District Court, in ruling out defendant's evidence that guards over the drums and clutches would not be practicable, brought about a situation where defendant was not afforded a fair trial. Jeffers testified that there used to be a kind of guard to keep the cables from flying off the drum, that it was to hold the cable in place, and that there was no other guard there. This evidence as to the drum and clutch being a dangerous place was not objected to by defendant, and some of it was drawn out by defendant on cross-examination. It would seem that defendant, not having objected to this evidence, is not in a position to complain of the situation produced. The trial court attempted to limit the issue as to the guard or housing to that particular section of the shaft where the plaintiff was found after the accident, instructing the jury: "The burden of proof is further on the plaintiff to show by a fair preponderance of all the evidence that the failure to protect the shafting and the collar revolving thereon, as alleged in the petition and as I have read it to you, by guards or housing, was the direct and proximate cause of plaintiff's injury."

■ It is urged that in sustaining a number of objections to questions asked of Mr. Crockett, state factory inspector of Iowa un-

der the commissioner of labor, prejudicial error was committed. It was attempted to be shown by Crockett that no notice had been served on the railway company or the Updike Grain Company to remedy the alleged dangers. Section 1482 of the Act provides as follows: "1482. Enforcement. It shall be the duty of the commissioner of labor of the state, and the mayor and chief of police of every city or town, to enforce the provisions of this chapter."

Section 1491 of the Act provides that the commissioner of labor or his inspector shall give notice to the person, company, or corporation operating a plant, of violations of the law. This is not a prerequisite to the operation of the law. The commissioner of labor and his inspector were not invested with discretion as to whether or not they should apply section 1487. The Legislature did not attempt to so provide. If the dangerous machinery should have been guarded under the statute, the fact that the state labor commissioner had not served any notice upon defendant or its lessee, or had done nothing whatsoever in relation to the matter, would not prevent recovery by plaintiff, if the facts brought him within the purview of the law. Carrigan v. Stillwell, supra; Steiert v. Coulter et al., 54 Ind. App. 643, 102 N. E. 113, 103 N. E. 117. Civil liability under section 1487 is not dependent on the actual issuance of such an order as contemplated by section 1491, though penal liability under section 1494 may be. However, the testimony of Crockett as to what he and the commissioner of labor did with reference to defendant's elevator would be important evidence bearing on the question of whether the machinery at the place of plaintiff's injury was "so located or used that employees may receive injury thereby," and whether it was practicable to guard or house the same. Many of the questions asked him called for mere legal conclusions, and objections to these were properly sustained; but we think the court did unduly restrict his testimony. Crockett was asked the following questions, and objections were sustained thereto:

"Q. Have you ever, as state factory inspector, at any time called upon the Updike Grain Company or the railway company to install any guards of any kind on the shafting that operates the unloading shovels in that elevator? * * *

"Q. Has the Commissioner of Labor, so far as you know, ever called upon either the railroad company or the Updike Grain Company to install housings or guards over the shafting I have mentioned?"

In view of the relationship of the commissioner of labor to the enforcement of this law, we think defendant was entitled to have these questions answered. If notice had been served by Crockett or the state labor commissioner to install guards on the shafting at the place of injury, it would have been competent to so show, and it would seem equally competent where no notice had been served by those charged with enforcing the law to show the same. The court permitted Crockett to testify as follows:

"Now, in your work as a factory inspector, in reaching a conclusion as to whether or not guards should be installed, do you take into consideration whether or not the location where the machinery is or the shafting is, is such that it is practicable in view of the use to which the shafting is put to house it?. A. Yes, sir.

"Q. Now, after having inspected this shafting in question at the Updike Elevator in Council Bluffs, what is your conclusion as such factory inspector as to whether or not it is practicable in view of the manner of the construction and the use to which the shafting in question has been and is being put, to house it? A. Yes, sir.

"Q. Now, after having inspected this shafting in question at the Updike Elevator in Council Bluffs, what is your conclusion as such factory inspector as to whether or not it is practicable in view of the manner of the construction and the use to which the shafting in question has been and is being put, to construct and maintain housings over that shafting?

"Mr. Murphy: To which plaintiff objects as irrelevant, immaterial, incompetent, and calling for a pure conclusion of the witness and invading the province of the court and jury in determining what is or is not practicable; also as being indefinite as to the parts to be guarded.

"The Court: The question seemed to be definite as to the shaft and collar.

"Mr. Dressler: Yes sir, I mean to include all of it.

"The Court: You mean to include the shaft and collar?

"Mr. Dressler: Yes sir, I include the shaft and collar.

"The Court: It seems to me that if that could be determined as a fact that there was no feasible way or practicable way to cover that—wouldn't that be a matter of defense?

"Mr. Murphy: I think the witness might testify by showing why they could not install guards.

"The Court: Well, that is a matter of cross-examination. He may answer the question.

"Plaintiff excepts.

"A. No, I wouldn't think it would be practicable to put a housing clear across there. * * *

"Q. Do you regard—do you think from your most recent inspection of this shafting or housing that it is a place where it would be practicable, in view of the situation of the shafting and the use to which it is put, to build or place guards thereover?

"Mr. Murphy: Objected to as incompetent, immaterial and calling for a conclusion of the witness.

"The Court: Overrule the objection—he may answer.

"Plaintiff excepts.

"A. No."

It is therefore apparent that the defendant did have the benefit in a limited way of the opinion of Crockett that it would not be practicable to place guards or housings at the place of injury. Crockett was not permitted to testify, however, as to the place being one where there was no reasonable probability of employees being injured. Defendant made this offer after objection to its question had been sustained.

"Mr. Dressler: Defendants offer to show by the witness that from his examination of the shafting in question, and in view of its location and the use to which it has been and is being put, and in view of the total absence of any previous injuries to employees working there, that his conclusion as state factory inspector is that it is not a location or place, and is not used so, that there is any reasonable probability that employees may receive injury thereby.

"Mr. Murphy: To which the plaintiff objects as incompetent, irrelevant, immaterial and calling for a pure conclusion of the witness.

"Objection sustained.

"Defendants except."

An objection to this was sustained. This related to a fundamental matter. The question of whether the plaintiff was hurt at a place where there was reasonable probability of injury to employees is necessarily one of opinion, and the state inspector's opinion would have been the strongest kind of evidence on this subject. Defendant was entitled to have this evidence before the jury. There was, we think, prejudicial error in some of the rulings as to the evidence of Crockett. Of course the evidence which might be given by Crockett is not conclusive on any question. Its weight and truth and effect is for the jury. We would not feel that the error in not permitting defendant to show the impracticability of guarding the drums and clutches after plaintiff had put that question into the case was sufficiently prejudicial standing alone to warrant a reversal of the case, but we are unable to escape the conclusion that much of what Crockett would testify to, judging from the offers to show the same, was competent evidence, and that the exclusion thereof did result in prejudice to defendant's case.

We are unable to agree with defendant's contention that the building of special walkways along the revolving shaft for the use of employees was sufficient compliance with the law. Special walkways are not guards. Nor can we agree with the argument that, because the Updike Grain Corporation might ultimately be required to pay any judgment that might be rendered in this case, therefore there can be no judgment against the railway company, as plaintiff, having recovered compensation from his employer, would by this action impose upon his employer additional compensation to him by way of damages. Plaintiff is not suing by virtue of the lease. He is suing defendant because of a claimed command of the statute that it shall perform a certain duty in the way of guarding dangerous machinery to protect the employees of its lessee operating the elevator. He is not concerned with the arrangements between defendant and his lessee. The judgment must be reversed, and the case remanded to the trial court for further proceedings.

Reversed and remanded.

VAN VALKENBURGH, Circuit Judge (concurring in part).

I concur in that portion of the opinion which concludes that this case must be reversed and remanded for a new trial for the reason therein stated. I cannot agree that that reason is or should be the sole ground for the reversal. The section of the Factory Act invoked is the following: "1487. Safety appliances—guarding machinery. It shall be the duty of the owner, agent, superintendent, or other person in charge of any workshop, manufacturing or industrial

establishment or concern operated by machinery, either in a fixed location or when portable and moved from place to place therein in carrying on such industry, so far as practicable, to install and keep in order belt shifters or other safe mechanical means for throwing belts on and off pulleys, install loose pulleys, and protect, by guards or housing, all gearing, cogs, belting, shafting, tumbling rods, universal or knuckle joints, set screws, saws, planes, and other machinery, when so located or used that employees may receive injury thereby. The provisions of this chapter shall not apply to agricultural pursuits."

In my judgment, the application of this factory statute is limited to the person, "in charge of any workshop, manufacturing or other establishment or concern operated by machinery," whether that person be the owner of that "establishment or concern," or his agent, superintendent, or any other person whomsoever. The language used, it seems to me, clearly makes the phrase "in charge of" limit all the persons previously enumerated. This is the natural and reasonable meaning of the phraseology employed. The act bears consistent internal evidence of this construction. The terms "employers" and "employees" constantly recur. An amendment (section 1495) removes the defense of assumption of risk as between employer and employees: "Assumption of risks. In all cases where the property, works, machinery, or appliances of an employer are defective or out of repair, and where it is the duty of the employer from the character of the place, work, machinery, or appliances to furnish reasonably safe machinery, appliances, or place to work, the employee shall not be deemed to have assumed the risk, by continuing in the prosecution of the work, growing out of any defect as aforesaid, of which the employee may have had knowledge when the employer had knowledge of such defect, except when in the usual and ordinary course of his employment it is the duty of such employee to make the repairs, or remedy the defects. Nor shall the employee under such conditions be deemed to have waived the negligence, if any, unless the danger be imminent and to such extent that a reasonably prudent person would not have continued in the prosecution of the work; but this statute shall not be construed so as to include such risks as are incident to the employment; and no contract which restricts liability hereunder shall be legal or binding."

This defense has its foundation in the relationship between master and servant, and is, in its true sense, a creature of contract. 5 Corp. Jur. 1412, 1413; Conrad v. Springfield Ry. Co., 240 Ill. 12, 17, 88 N. E. 180, 130 Am. St. Rep. 251; Chicago & Eastern Illinois R. Co. v. Randolph, 199 Ill. 126, 131, 65 N. E. 142; Shoninger Co. v. Mann, 219 Ill. 242, 246, 76 N. E. 354, 3 L. R. A. (N. S.) 1097; St. Louis Cordage Co. v. Miller (C. C. A. 8) 126 F. 495, 63 L. R. A. 551.

There are sporadic cases where the term is loosely applied to relationships other than those between master and servant, involving "taking the risk," and "running the risk," where the danger is known and appreciated; but such action savors rather of contributory negligence than of assumption of risk. This consideration is not adduced as conclusive of the scope of the Iowa Factory Act, but as bearing upon the legislative intent. It is true that the Supreme Court of Iowa has not passed expressly upon this precise point, but the language of its opinions, I think, points strongly to the interpretation I have placed upon the application of the act. Morse v. Houghton, 158 Iowa, 279, 136 N. W. 675; Wheeler v. Brick Co., 162 Iowa, 414, 142 N. W. 400; Plew v. Horrabin & Co., 176 Iowa, 584, 157 N. W. 453; Nodland v. Kreutzer & Wasem, 184 Iowa, 476, 168 N. W. 889; Hainer v. Churchill (Iowa) 173 N. W. 882, 883.

It is significant that in four of these cases the propositions involved and decided are digested in the syllabi under the heading "Master and Servant." In Hainer v. Churchill, this language is found: "The propriety of such legislation has been emphasized by the increasingly great number of men, women, and children employed to serve in and about factories, mills, shops, and other industrial works, where they are exposed to danger from the operation of machinery, and to insure observance by employers of their duty to provide their employees reasonably safe places in which to work."

The balance of the opinion, too long for quotation here, is equally illuminating. And in Nodland v. Kreutzer & Wasem, supra, 184 Iowa, 476, 168 N. W. 889, loc. cit. 890 and 891:

"Section 4999a3 of the Supplement to the Code provides: 'That in all cases where the property, works, machinery or appliances of an employer are defective or out of repair, and where it is the duty of the employer from the character of the place, work, ma-

chinery or appliances to furnish reasonably safe machinery, appliances or place to work, the employee shall not be deemed to have assumed the risk, by continuing in the prosecution of the work, growing out of any defect as aforesaid, of which the employee may have had knowledge when the employer had knowledge of such defect, except when in the usual and ordinary course of his employment it is the duty of such employee to make the repairs, or remedy the defects. Nor shall the employee under such conditions be deemed to have waived the negligence, if any, unless the danger be imminent and to such extent that a reasonably prudent person would not have continued in the prosecution of the work.' * * *

"The design of the Legislature evidently was to enjoin upon employers the necessity of using the greatest reasonable care and precaution to see that all dangerous machinery is efficiently guarded and that employees, so far as it can reasonably be done, shall be protected from danger in operating, or working in and about, the same."

It is to be noted that the Oklahoma statute, providing that "the owner or person in charge of a factory or any institution where machinery is used, shall provide," etc., has been construed to apply only to the person "having charge" of such factory or institution. Hane v. Mid-Continent Petroleum Corp. (D. C.) 43 F.(2d) 406, and, under same title (D. C.) 47 F. (2d) 244, 246. The Iowa statute makes this construction still more obvious by the use of the word "other." It says: "It shall be the duty of the owner, agent, superintendent, or *other* person in charge" etc. (Italics mine.)

In United States v. Standard Brewery, 251 U. S. 210, 40 S. Ct. 139, 140, 64 L. Ed. 229, defendants were indicted for the unlawful use of certain grains, cereals, fruits, and other products in the manufacture of beer for beverage purposes, in violation of the wartime prohibition act. The statute prohibited the use of such products for making "beer, wine, or other intoxicating malt or vinous liquors for beverage purposes." The contention of the government was that the intention of the legislation was to include beer and wine whether intoxicating or not. This contention was rejected by the Supreme Court, which held "that the word 'intoxicating' qualifies the terms preceding, thus excluding from the prohibition beer which is not in fact intoxicating." In the opinion, the court cited United States v. United Verde

Copper Co., 196 U. S. 207, 25 S. Ct. 222, 49 L. Ed. 449, and quotes thus from Lord Bramwell, in Great Western Ry. Co. v. Swindon, etc., Ry. Co., L. R. 9 App. Cas. 787, 808: "As a matter of ordinary construction, where several words are followed by a general expression as here, which is as much applicable to the first and other words as to the last, that expression is not limited to the last, but applies to all."

See, also, Porto Rico Railway, Light & Power Co. v. Mor, 253 U. S. 345, 40 S. Ct. 516, 518, 64 L. Ed. 944, which holds that: "When several words are followed by a clause which is applicable as much to the first and other words as to the last * * * the clause should be read as applicable to all."

The "establishment or concern" referred to is the "business" there conducted and operated. Certainly appellant had no "charge" of this business. It neither had nor contemplated the ownership, interest in, or operation of that business. The building contained the plant, embracing the machinery, but formed no part of the "industrial establishment." It is true that appellant, before leasing, had installed the greater part of the mechanical appliances, but the duty respecting these rested upon the person undertaking to put them in operation. The duty imposed by the act arose only when operation began.

The error in the construction of this act arises from a failure to distinguish between the classes of persons to whom the owner of a building owes a duty, and those to whom no duty is owed. This distinction is very well expressed by this court in Fraser v. Kruger, 298 F. 693, 696:

"Where premises are leased for public or semipublic purposes, and at the time of the lease conditions exist on the premises which render them unfit for the purpose intended or constitute a nuisance, and the landlord knows or by the exercise of reasonable care ought to know of the conditions, and a third person suffers injuries on account thereof, the landlord is held liable because such third person is there at the invitation of the landlord as well as the tenant. Colorado Mortgage & Investment Co. v. Giacomini, 55 Colo. 540, 136 P. 1039, L. R. A. 1915B, 364; note L. R. A. 1915B, 364.

"The landlord is also liable, as owner of the leased premises, to third persons, who do not derive their right to be where they are from the tenant, but stand strictly on

their rights as strangers, and who suffer injuries from a nuisance existing on the premises at the time of the letting. Maloney v. Hayes, 206 Mass. 1, 91 N. E. 911, 28 L. R. A. (N. S.) 200, 3 N. C. C. A. 137; 16 R. C. L. p. 1074, § 593.

"And where the nuisance is one which is dangerous to the general public, to persons not upon the premises, a lease of the premises does not relieve the landlord but the duty continues as to such persons so long as the nuisance remains unabated. But where the nuisance involves no danger to persons off of the premises and a tenant has taken possession and control thereof under a lease for private purposes, the owner has no further right to invite persons to go upon the premises, and guests, servants, employees, and other persons who go upon the demised premises at the invitation of the lessee are in the same position as the lessee himself. Not being invitees of the owner he owes them no duty except as they may claim through the lessee. Bailey v. Kelly, 93 Kan. 723, 145 P. 556, L. R. A. 1916D, 1220; Missel v. Lennox (1st C. C. A.) 156 F. 347, 84 C. C. A. 243."

This explains the responsibility of the owner where buildings are required by law to be built in a certain way, and with certain appurtenances, and safeguards designed for the protection of the general public or for the tenants in whole or in part of a particular building. This covers the fire escape cases, the elevator cases, attractive nuisance cases, and has especial application to the "downspout" case of Updegraff v. City of Ottumwa, 210 Iowa, 382, 226 N. W. 928, involving violation of a municipal code requiring property owners to maintain sidewalks in a safe condition. Much depends upon a retention of control by the landlord, and common use by tenants, of facilities, such as elevators, stairways, etc. See Morse v. Houghton, 158 Iowa, 279, 136 N. W. 675. This Iowa act in and of itself imposes no duty upon the owner of a building in which an industrial establishment or concern is located, but only upon the person in charge of that establishment or concern. There is no analogy between the duty it imposes and that arising from a general public duty owed by a carrier, which cannot be delegated to a lessee. Southern Ry. Co. v. Hussey (C. C. A. 8) 42 F.(2d) 70, 74 A. L. R. 1172. It is recognized that the duty imposed upon the landlord is one for the benefit of the public generally—where the lease is made for public or semipublic purposes, or where that duty arises from statutory or ordinance requirements respecting the construction or equipment of buildings, and the character of their occupancy, to which reference has been made. It is sought to impress this general public character upon the employees and workmen in the elevator under consideration. Under the situation presented, that cannot be done. It is true that all citizens are a part of the public in an abstract sense. But the employees of this elevator cannot be so classed for the purpose of imposing liability upon appellant, under the record in this case. This law, "designed to enjoin upon employers" greater care for the protection of their employees, should be liberally construed, but the humanitarian purpose should not be extended to impose liability upon strangers to the enterprise. I think the motion for a directed verdict should have been sustained.

GARDNER, Circuit Judge, concurs in the foregoing opinion of VAN VALKEN-BURGH, Circuit Judge.